**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

LUIS ROSALES,

                                                Plaintiff,

       v.                                    No. 11-CV-106
                                               (MAD/CFH)

THOMAS LaVALLEY, Superintendent, Clinton
Correctional Facility; BRIAN FISCHER,
Commissioner, Department of Correctional Services;
KENNETH S. PERLMAN, Deputy Commissioner
for Program Services, Department of Correctional
Services; DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION; JOHN SERHAN,
Consulting Audiologist for the Department of
Corrections and Community Supervision,

                                 Defendants.[1]

_____

**APPEARANCES:**                            **OF COUNSEL:**

LUIS ROSALES
Plaintiff Pro Se
91-A-3067
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929

HON. ERIC T. SCHNEIDERMAN          MICHAEL G. McCARTIN, ESQ.
Attorney General for the                    Assistant Attorney General
   State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

_____

     [1]The New York State Department of Correctional Services merged with the Division of Parole and is now the New York State Department of Corrections and Community Supervision.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Luis Rosales ("Rosales"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, DOCCS and four of its employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 28). Additionally, Rosales asserts claims pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Id. Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 46. Rosales opposes the motion. Dkt. No. 52. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to Rosales as the non-moving party. See subsection II(A) infra. During all relevant times, Rosales was an inmate at Clinton Correctional Facility ("Clinton").

## A. Directive #2612

To comply with the requirements of Title II, DOCCS issued Directive # 2612 ("Directive"), which addresses accommodations made for inmates with sensorial disabilities, including

---

[2]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

hearing and seeing impairments.[3] Am. Compl. ¶ 14; Directive # 2612 (Dkt. No. 46-8) at 1.

A sensorial disability is defined as one that "substantially limits one or more of the person's

major life activities and meets the definition of . . . deaf or hard of hearing . . . ." Directive

# 2612 at 1. The Directive defines "deaf" and "hard of hearing" as follows:

> Deaf (HL 10): Severe profound hearing loss in the BETTER ear
> unaided of at least 70 dB as measured by the Pure Tone
> Audiometry (PTA - 500, 1000 and 2000 Hz) or unaided Speech
> Recognition Threshold (SRT) or primarily relies on visual
> communication such as sign language, writing, visual cues or
> gestures. (Does not include unilateral deafness).
>
> Hard of Hearing (HL 20): Hearing loss in the BETTER ear
> unaided of less than 70 dB as measured by the Pure Tone
> Audiometry (PTA - 500, 1000 and 2000 Hz) or unaided Speech
> Recognition Threshold (SRT) or functional hearing
> communication difficulties with proper amplification as
> determined by a person with expertise in the field of deafness.
>
> Non-Significant Hearing Loss (HL 30): Hearing loss in the
> BETTER ear unaided of less than 40 dB as measured by the
> Pure Tone Audiometry (PTA - 500, 1000 and 2000 Hz) or
> unaided Speech Recognition Threshold (SRT). Inmates with
> non-significant hearing loss need only hearing aid(s) and
> preferred seating as a reasonable accommodation and do not
> need a designated facility.

Id. at 2. Reasonable accommodations available for issuance to an inmate with a hearing

impairment, classified as either HL 10 or HL 20, for participation in a program or service

include both Shake Awake alarm clocks ("Alarm") and telephone amplifiers. Id. at 14.

Additionally, inmates classified as either HL 10 or HL 20 may be transferred to a designated

facility that can accommodate specific needs. Id. at 3.

    Rosales contends that the physicians who examined him should not have applied the

_____

[3]Defendants submitted the Directive dated October 26, 2010, which supersedes
Directive # 2612 dated November 16, 2007. Directive # 2612 at 1.

Directive as a bright line-rule. Rosales Dep. (Dkt. No. 46-3) at 32–33. Instead, physicians should treat each patient's hearing loss on a case-by-case basis. Id. As support for this argument, he cites to a letter sent by a representative from the American Speech-Language-Hearing Association, noting:

> Often, there is the assumption that one "normal" ear is all that is needed for developing language, learning speech, participating in social communication . . . however, persons with a hearing loss similar to [Rosales's] may experience communication problems and often have greater difficulty: when there is background noise or competing sounds[;] when located far away from the speaker or sound source; identifying where sounds are coming from [; and] when the better ear is turned away from the speaker or sound source.

Letter from Beverly-Ducker (Ex. A attached to Pl.'s Aff. in Opp.) (Dkt. No. 52-2) at 2. In short, Rosales essentially disagrees with the Directive's classification system for inmates with hearing impairments and contends that the needs of inmates with hearing impairments are not being met. Am. Compl. ¶ 18.

## B. Hearing Impairments

Rosales is an inmate who suffers from a documented history of hearing impairments.[4]

---

[4]See, e.g., Letter from Stelmachowicz dated July 20, 2011 (Ex. B attached to Pl.'s Aff. in Opp.) (Dkt. No. 52-2) at 5 (opining that a hearing aid is unlikely to improve Rosales's hearing abilities in the left ear, that Rosales has a profound hearing loss in his left ear and borderline normal hearing in the right ear, and that Rosales may miss the first part of a conversation or have difficulty following a conversation between multiple speakers); Letter from Beverly-Ducker dated July 18, 2011 (Ex. A attached to Pl.'s Aff. in Opp.) (Dkt. No. 52-2) at 2 (opining that test results demonstrate that Rosales has "slightly elevated thresholds in [his] right ear. Recorded thresholds for [his] left ear indicate a profound hearing loss. [He is] basically relying upon the hearing in [his] right ear."); Audiologic Evaluation dated December 3, 2009 (Ex. A attached to Defs.' Mot. for Summ. J.) (Dkt. No. 46-4) at 3–4 (reporting an evaluation which showed that with his right ear, Rosales was able to understand seventy-six percent of the words presented at his

Am. Compl. ¶ 19.  As the result of a fire, Rosales began to suffer hearing loss in his left ear

at the age of seven.  Audiologic Evaluation (Dkt. No. 46-4) at 2.  He alleged that the hearing

in his right ear began to diminish after a blow to the head.  Id.  Specifically, Rosales asserts

that he suffers from complete deafness in his left ear and a twenty-percent hearing loss in

his right.  Am. Compl. ¶ 19.  For treatment, an audiologic evaluation prepared by the

Westchester Institute for Human Development ("Westchester") recommended that Rosales

should have conversations in quiet environments with the speaker closer to his right ear and

Rosales's right ear should be monitored annually.  Audiologic Evaluation at 5.

On February 8, 2010, Rosales was examined by Dr. Johnson in a small room without

any background noise.  Rosales Dep. at 29, 31.  Rosales conceded that he could have a

normal conversation with the three other people at the examination.  Id. at 31.  It was also

during the examination that Rosales requested an Alarm.  Id. at 32.  However, Johnson

denied Rosales's request because he was determined to have had non-significant hearing

loss, or HL 30.  Id.

Dr. Serhan, defendant and a certified clinical audiologist who works as a DOCCS

consultant, has been monitoring Rosales's hearing since December 3, 2009, as

recommended by Westchester.[5]  Serhan Decl. (Dkt. No. 46-5) ¶¶ 1, 7.  Serhan examined

---

admitted pure-tone thresholds, eighty-eight percent of the words presented at 5 dB above
his pure-tone thresholds, and a hundred percent of the words presented at 10 dB above
his pure-tone thresholds when listeners typically require speech to be approximately 30 to
35 dB above their pure tone thresholds to achieve this score).

[5]Rosales attached a complaint to his affidavit in opposition, addressed to Keysor,
deputy superintendent/administrator of DOCCS, stating that Serhan threatened to issue
false reports against him for filing a lawsuit.  Letter to Keysor dated February 28, 2012 (Ex.
E) (Dkt. No. 52-2) at 12–13.  Because these allegations occurred on February 28, 2012,
more than six months after the filing of the amended complaint, they are not considered as
part of this action.

Rosales's hearing on December 21, 2010 and classified Rosales as a "Non-Significant Hearing Loss (HL 30)" inmate and "a hearing aid candidate." Id. ¶¶ 8–10. Serhan again examined Rosales on March 29, 2011 and scheduled Rosales to be treated by a doctor for ear pain before providing Rosales with a hearing aid. Id. ¶ 11. On June 7, 2012, Serhan provided Rosales a functional hearing aid for the right ear. Id. ¶ 12.

During Rosales's deposition, taken for this action, the following ensued with regards to Rosales's hearing abilities:

> Q. Tell me about your hearing.
>
> A. If it's in – if I'm in a quiet room, pretty much I can hear;
> low, but I could hear conversation. It's low, but I could
> hear it. If it's noisy, like it is out in the yard, I can't hear
> nothing.
>
> Q. So background noise makes it harder for you to
> comprehend what people are talking to you about?
>
> A. Exactly.
>
> Q. Now, you would agree with me that during the course of
> the deposition so far, you're able to hear me fairly – very
> well; isn't that correct?
>
> A. That's correct. There's no noise here; just me and you.
> Nobody's speaking, so yes, I could hear you. It still is low,
> but I can hear you pretty decent.

Rosales Dep. at 18. The deposition took place in a small room without any background noises where counsel sat four to five feet away from Rosales. Pl.'s Aff. in Opp. ¶ 27. Rosales's main concern with his hearing impairments is that background noise aggravates his hearing abilities. Rosales Dep. at 18–19. Returning to the general prison population

from confinement in the Special Housing Unit ("SHU"),[6] Rosales is concerned that he will not hear direct orders from correctional officers, specifically when is in the yard.  Id.

### C.  Medical Indifference

Because of his HL 30 classification, Rosales asserts that he was consistently denied assistive devices other than a hearing aid to accommodate his hearing needs.  Am. Compl. ¶ 21.  Through letters from himself and his wife, Rosales communicated to defendant Fischer, commissioner of DOCCS, and defendant Perlman, deputy commissioner for programs and services, that he was denied basic services because of his hearing impairments.  Id. ¶ 26.  However, the letters were left unanswered.  Id.  Through verbal conversations, Rosales communicated to defendant LaValley, a superintendent at Clinton, that he was denied basic services to accommodate his hearing impairment, to which LaValley replied Rosales needed "to make the best of a bad situation."  Id. ¶ 27.

Rosales alleged that when he explained to Serhan that the reason for the denial of his requests was because of his hearing impairments, Serhan agreed to recommend an Alarm be provided "and a transfer to a Facility that can accommodate [Rosales's] hearing impairment."  Am. Compl. ¶ 28.  However, such recommendations were not made.[7]  Id.

_____

[6]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

[7]Rosales contends that instead of issuing an Alarm, defendants could transfer him to a designated facility where accommodation is more readily available.  Pl.'s Aff. in Opp. ¶ 35.  Liberally construing this allegation, Rosales was attempting to allege a Due Process claim under the Fourteenth Amendment.  However, the Due Process clause of the Fourteenth Amendment does not provide an inmate with the right to be housed in a

On or around November 17, 2010, Rosales filed a grievance, presumably against defendants for denying him certain assistive devices to accommodate his hearing impairments. Medical Grievance (Ex. H attached to Pl.'s Aff. in Opp.) (Dkt. No. 52-2) at 25–27. Rosales specifically disagreed with the diagnosis of his hearing loss. Id. at 25. In November and December of 2010, Rosales informed Ratcliff, the supervisor for the inmate grievance procedures program, of the grievance and requested investigation in the matter. Id. at 23, 24.

### D. Reasonable Accommodations

During his deposition, Rosales expressly stated that he does not seek monetary damages, rather, he seeks to be provided reasonable accommodations. Rosales Dep. at 12–13. For Rosales, reasonable accommodations include an Alarm. Id. at 13. While Rosales does not know the intricacies of how the Alarm works, he understands that inmates with hearing impairments use them. Id. at 13–14. Rosales contends that he requires this Alarm to decrease his difficulty in hearing the prison bell. Id. at 12. He could not sleep with the hearing aid because it might puncture his eardrum and he must sleep either on his right side or his back because his left side is sensitive due to burns from the fire. Id. at 44. Rosales does not have a cell mate and relies on nearby inmates to bang on his cell walls to

---

particular facility. Meachum v. Fano, 427 U.S. 215, 224 (1976). Moreover, deference is accorded to prison officials in making movement and classification decisions. Turner v. Safely, 482 U.S. 78, 84–85 (1987) (noting that "'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform' . . . [w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." (citation omitted)). Thus, Rosales has failed to allege a Fourteenth Amendment claim based on transfer to a designated facility.

alert him of the breakfast bell.  Id. at 44–45; Pl.'s Aff. in Opp. ¶ 21.

Defendants do not cite to a Directive provision concerning the standards for issuing an Alarm.  However, it is DOCCS's practice that it does not "indiscriminately" issue Alarms to inmates because they have been used for sexual stimulation and some inmates have rented them out for the same purpose, creating a black market for the item.  Heywood Decl. (attached to Defs' Mot. for Summ. J.) (Dkt. No. 46-10) ¶ 5.

Rosales also requests a telephone amplifier as an accommodation to his hearing loss. Rosales Dep. at 13.  He did not submit a request for a telephone amplifier until the week prior to February 10, 2012 because he was in SHU until January 15, 2012, which prohibited telephone uses.  Id. at 52, 58.  Because the telephones at Clinton are situated closely to one another, Rosales could not hear through those telephones, not even the operator.  Id. at 15.  This impedes him from communicating with family members.  Id.


### E.  Injuries

Rosales asserts that because of his HL 30 diagnosis, he suffers serious hardship on a daily basis and lives in harsh conditions that pose danger to his health and safety.  Am. Compl. ¶ 3.  Rosales specifically alleged that he missed call-outs for meals, recreation, showers, and medications because he could not hear the staff announcing those activities' commencement.  Id. ¶ 24.  He contends that he missed lunches and dinners approximately ten to twelve times between January 15 and February 10, 2011.  Rosales Dep. at 52. Rosales also contends that he has serious conflicts with other inmates due to his practice of asking inmates to either scream for him or bang on his cell walls when the breakfast bell rang.  Pl.'s Aff. in Opp. ¶ 21; Rosales Dep. at 52.  The bell is located at the front of the

gallery, which is too far for him to hear.  Rosales Dep. at 42.  Rosales further contends that he was the victim of an assault because, as he testified at the deposition for this case, he experienced problems with another inmate, an incident which would not have occurred but for the denial of necessary accommodations for his hearing impairments.  Pl.'s Aff. in Opp. ¶¶ 21, 22; Ex. D (attached to Pl.'s Aff. in Opp.) at 9.

Rosales conceded that he never received a ticket for not following orders from a DOCCS employee; however, he had incidents with the staff because he could not hear them, especially when he is in the yard.  Rosales Dep. at 39.  Rosales contends that correctional officers may not necessarily know that he has hearing impairments because if he keeps his hair long, the hearing aid in his right ear and the deformity of his left ear would be hidden.  Id. at 39–41.

## F.  Relief

On August 10, 2011, Rosales commenced this action seeking declaratory and injunctive relief.  Am. Compl. ¶ 1.  Specifically, Rosales requests the Court to:  (1) declare the defendants' acts, omissions, policies, and practices violated his rights under the Eighth and Fourteenth Amendments, the ADA, and the Rehabilitation Act; (2) enjoin the defendants from carrying out the alleged violations; (3) order the defendants to abolish the allegedly discriminatory Directive; (4) elevate his hearing loss classification to "serious," presumably higher than HL 30; and (5) provide him with assistive devices other than a hearing aid and adequate reasonable accommodations at any facility that he would be housed.  Am Compl.

¶ 42.  In addition, Rosales seeks the appointment of counsel to represent him in this case.[8]
Id. ¶¶ 43, 44.

## II. Discussion

Rosales contends that the defendants, in their official capacities only, violated his (1) Eighth Amendment rights when they acted with deliberate indifference to his serious medical needs and the defendants violated his (2) rights under the ADA and the Rehabilitation Act when they failed to provide adequate and reasonable accommodations for his hearing impairments.  Am. Compl. ¶¶ 2, 6–9.  Rosales also alleged an Equal Protection claim under the Fourteenth Amendment, contending that the Directive is unconstitutional.  Id. at ¶ 42.

Defendants seek dismissal, contending that Rosales:  (1) failed to establish the personal involvement of defendants Fischer, Perlman, and LaValley for purposes of the § 1983 claims; (2) was provided with medical treatments meeting constitutional requirements; (3) was provided with reasonable accommodations meeting the requirements of the ADA and Rehabilitation Act; and (4) failed to exhaust his administrative remedies as related to the request for a telephone amplifier.  Defendants also contend that they are entitled to qualified immunity.

_____

[8]Rosales further requests the Court to award him costs and disbursements. However, because Rosales was granted in forma pauperis status on May 11, 2011, this request is of no moment.  Dkt. No. 7.

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.


## B.  § 1983 Claims

### 1.  Exhaustion

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); see also Porter v. Nussle, 534 U.S. 516, 524 (2002).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."  Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999).  The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate.  Porter, 534 U.S. at 524.  Exhaustion must be proper, meaning that all agency requirements are timely complied with, as "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement."  Ruggiero v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006) (citing Woodford v. Ngo, 548 U.S. 81, 83, 90–91 (2006)).  "The ADA falls within the rubric of 'any other federal law.'"  Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004)).  Thus, the PLRA exhaustion requirement is also enforced against ADA claims.  Alster v. Goord, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).

13

As an initial matter, under the PLRA, failure to exhaust administrative remedies is an affirmative defense.  <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007).  Thus, an inmate is "not required to specially plead or demonstrate exhaustion in [his] complaint," and a defendant must raise the issue of exhaustion and establish plaintiff's failure to demonstrate it in his responsive pleading.  <u>Id.</u>  Because, defendants raise exhaustion in their motion for summary judgment, in response to Rosales's amended complaint, this Court may appropriately consider this issue at this time.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  <u>Ruggiero</u>, 467 F.3d at 175 (citing <u>Giano v. Goord</u>, 380 F.3d 670, 677 (2d Cir. 2004)).  A court must conduct a three-part inquiry to determine if an inmate's failure to follow the applicable grievance procedures is fatal to his or her claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

<u>Ruggiero</u>, 467 F.3d at 175 (citing <u>Hemphill v. New York</u>, 380 F.3d 680, 686 (2d Cir. 2004)).

The exhaustion requirement is similar to the rules of notice pleading; thus, a grievance is not required to "lay out the facts, articulate legal theories, or demand particular relief" as long as it provides the nature of the alleged misconduct.  <u>Johnson v. Testman</u>, 380 F.3d 691, 697 (2d Cir. 2004) (citing <u>Strong v. David</u>, 297 F.3d 646, 650 (7th Cir. 2002)). However, the grievance must ensure that prison officials are afforded "time and opportunity to address complaints internally."  <u>Porter</u>, 534 U.S. at 524–25; <u>Johnson</u>, 380 F.3d at 697.

14

Here, defendants argue that Rosales failed to exhaust his administrative remedies with regards to the request for a telephone amplifier.  Defs' Mem. of Law (Dkt. No. 46-12) at 13. While Rosales conceded to having requested the telephone amplifier after the filing of his amended complaint, he contends that an inference can be drawn from his grievance that complaints concerning the denial of reasonable accommodations and certain assistive devices would include a telephone amplifier.  Pl.'s Aff. in Opp. ¶¶ 38–40.  However, these contentions do not diminish the fact that the prison officials were not afforded "time and opportunity to address" Rosales's specific complaint regarding the telephone amplifier. Porter, 534 U.S. at 524–25; Johnson, 380 F.3d at 697.  Moreover, Rosales does not allege, nor does the record show, that administrative remedies were not available to him, defendants waived the defense or were estopped from raising the defense, or a special circumstance exists meriting an exception to the exhaustion requirement.  Since no exception is applicable and no genuine issue of material fact is present, this Court concludes that Rosales has failed to exhaust his administrative remedies prior to requesting a telephone amplifier in this federal action.

Rosales's counter-argument against the PLRA exhaustion requirement based on enforcement of the "Clarkson Consent Decree" must fail as a matter of law.  Pl.'s Aff. in Opp. ¶ 42.  Rosales stated that the Court should not grant defendants' motion on the exhaustion issue because this action requests the Court, in part, to enforce the "Clarkson Consent Decree."  It is established that

> [t]he exhaustion requirement of the PLRA does not apply to motions that exclusively seek the enforcement of the terms of the Consent Decree . . . [however, h]ybrid actions, in which a plaintiff class member files an independent action asserting claims under the ADA, Rehabilitation Act, the PLRA, and 42

U.S.C. § 1983 and 1985, as well as a <u>Clarkson</u> contempt claim,
. . . must exhaust according to PLRA requirements.

<u>Clarkson v. Coughlin</u>, No. 91-Civ-1792 (RWS), 2006 WL 587345, *3 (S.D.N.Y. Mar. 10, 2006) (citation omitted).[9]  Here, Rosales asserts a hybrid action under the ADA, Rehabilitation Act, and § 1983.  This alone sufficiently defeats Rosales's argument against exhaustion.  Accordingly, defendants' motion on this ground should be granted.

### 2.  Personal Involvement

Defendants contend that Rosales failed to establish the personal involvement of Fischer, Perlman, and LaValley.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  <u>Id.</u>; <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

---

[9]All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[10]


### a. Fischer and Perlman

Rosales contends that Fischer and Perlman violated his Eighth Amendment rights because they were deliberately indifferent to his serious medical needs. Rosales sued Fischer and Perlman because he wrote to them explaining his medical needs, relying on their rank in the prison system, but his complaints were ignored. Rosales Dep. at 59–61. However, attempts to establish personal involvement based upon the supervisory role these defendants occupied is inappropriate. Wright, 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement). Moreover, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a

---

[10] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were trantionally used to determine personal involvement. See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

17

letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Here, Rosales does not allege that Fischer or Perlman investigated his complaints, only that he had notified them of his complaints. Pl.'s Aff. in Opp. ¶ 7. Therefore, the personal involvement of Fischer and Perlman, for the Eighth Amendment claims, has not been established through the letters sent by Rosales and his wife. Accordingly, defendants' motion on this ground should be granted.

Rosales also contends that Fischer and Perlman violated his rights under the Equal Protection clause of the Fourteenth Amendment because Fischer and Perlman subjected him to, and allowed the continuance of, the allegedly unconstitutional Directive. Am. Compl. ¶¶ 30, 42. Because these allegations are covered under Colon and there are genuine issues of material fact with regard to the constitutionality of the Directive, see subsection II(B)(4) infra, Rosales has sufficiently established the personal involvement of Fischer and Perlman. Accordingly, it is recommended that Fischer and Perlman remain as defendants in this action.


### b. LaValley

Rosales contends that LaValley violated his Eighth Amendment rights because he was deliberately indifferent to his serious medical needs. Rosales named LaValley as a

defendant because as the superintendent, LaValle was responsible for the medical care administered to him.  Rosales Dep. at 56–57.  Rosales also contends that LaValle knew of his medical needs through verbal conversations but failed to remedy the alleged violations.  Id.

> It has been held that "an appropriate guiding principle" for determining personal responsibility is where a grievance alleges an "ongoing" constitutional violation, the supervisory official who reviews the grievance is "personally involved" if he is confronted with a situation that he can remedy directly.  If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.

Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (internal citations omitted).

Rosales indicated that he spoke with LaValle about his medical needs on a weekly basis for eleven and a half months while he was in SHU.  Rosales Dep. at 57.  Thus, Rosales has established that those conversations served as notice prior to the alleged ongoing constitutional violation, specifically the alleged denial of medical care that continued upon Rosales's release to the general prison population in January 2011.  Id. at 52.  Therefore, these conversations were sufficient to establish personal involvement on the part of LaValle.

Moreover, Rosales also alleged that LaValle subjected him to, and allowed the continuance of, the allegedly unconstitutional Directive.  Am. Compl. ¶¶ 30, 42.  As previously discussed concerning Fischer and Perlman, these allegations also sufficiently established the personal involvement of LaValle.   Accordingly, defendants' motion on this ground should be denied.

### 3.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834.  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance v. Armstrong, 143 F.3d 698,

702 (2d Cir. 1998).  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  <u>Farmer</u>, 511 U.S. at 844.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  <u>Chance</u>, 143 F.3d at 703.  Hence, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim."  <u>Sonds v. St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, there is no dispute that Rosales's hearing loss constituted a serious medical need.  While nothing in the record indicates that Rosales suffers from chronic and substantial pain as a result of his hearing loss, the record reflects that Rosales's hearing loss was worthy of comment or treatment and affected daily activities such as taking meals, recreation time, showers, and medication.  Am. Compl. ¶ 24; <u>see</u> <u>e.g.</u>, Serhan Decl. ¶¶ 1, 7, 8–12; <u>see</u> <u>generally</u> Audiologic Evaluation.  Thus, drawing all reasonable inferences in the light most favorable to Rosales, the severity of the alleged denial of care that is judged within the context of the surrounding facts renders Rosales's medical conditions sufficiently serious.

### a. LaValley

Rosales contends that defendant LaValley acted with deliberate indifference to his medical needs.  As previously discussed, Rosales alleged that he notified LaValley for over

eleven months with regards to his medical needs. LaValley disregarded this knowledge and never responded in any manner. However, the record and testimony show that Rosales was provided with annual audiology exams and a hearing aid and for the reasons indicated infra, Rosales received appropriate and timely medical care for his serious medical needs. Thus, despite Rosales's conclusory and unsupported claims that LaValley intentionally denied or delayed Rosales access to medical care, the undisputed facts belie such contentions and acknowledge that Rosales received constitutionally appropriate care. Accordingly, defendants' motion on this ground should be granted.

### b. Serhan

Rosales's Eighth Amendment claim against Serhan must fail because Rosales failed to demonstrate that Serhan was deliberately indifferent to his medical needs. Serhan reasonably responded to Rosales's medical needs by issuing him a hearing aid and monitoring his hearing annually. Serhan Decl. ¶¶ 7, 12. Thus, Rosales failed to show that Serhan intentionally denied or interfered with his medical treatments. Rosales also contends that the annual evaluations that were conducted as recommendations by Westchester were "largely ineffective." Pl.'s Aff. in Opp. ¶ 19. Yet, Rosales conceded that even though he could not hear as well when there was background noise, he could still hear with his right ear with the assistance of a hearing aid. Rosales Dep. at 18. "Prison officials have 'broad discretion in determining the nature and character of medical treatment afforded to inmates, and inmates do not have the right to the treatment of their choice." Brown v. Selwin, 250 F. Supp. 2d 299, 307 (S.D.N.Y. 1999) (citations omitted); see also Ross v. Kelly, 784 F. Supp. 35, 44–45 (W.D.N.Y. 1992). Thus, because Serhan responded

to Rosales's medical needs, it cannot be said that Serhan was deliberately indifferent to Rosales's medical conditions.  <u>Chance</u>, 143 F.3d at 703.  Accordingly, defendants' motion on this ground should be granted.


### 4. Fourteenth Amendment

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985); <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

<u>Vegas v. Artus</u>, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  With respect to prisoners, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . . means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  <u>Phillips</u>, 408 F.3d at 129.  More specifically, where the constitutionality of a prison regulation is implicated, the Court applies a four-factor test to determine the reasonableness of the regulation.  The Court looks at:

> [(1) whether there is] a valid, rational connection between the prison regulation and the legitimate governmental interest[;] . . . [(2)] whether there are alternative means of exercising the right that remain open to prison inmates[;] . . . [(3)] the impact accommodation of the asserted constitutional right . . . on guards and other inmates, and on the allocation of prison resources generally[; and (4)] the absence of ready alternatives . . . [which] is evidence of the reasonableness of a prison regulation.

Turner, 482 U.S. at 90 (internal quotation marks and citations omitted).

An application of the Turner factors, which defendants do not directly address in their motion for summary judgment, demonstrates that there exist genuine issues of material fact concerning Rosales's equal protection claim. Construing the facts and any reasonable inferences in the light most favorable to the plaintiff, Rosales contends that while the Directive's classifications are indiscriminately applied to all inmates with hearing impairments, the classifications, upon which accommodations are based, are overly restrictive, resulting in disproportionate impact on similarly situated inmates within the different hearing loss levels. Am. Compl. ¶¶ 15–18, 32–33. First, it is unclear whether there is a rational relationship between the classifications and a legitimate governmental interest. Defendants explain that the Alarms are not indiscriminately issued to inmates in order to avoid the creation and facilitation of a black market for the item. Heywood Decl. ¶ 5. However, these Alarms are issued to other inmates classified with more severe hearing loss levels; thus, the Alarms are still being disseminated to the general prison population. Directive # 2612 at 14. Second, while transfer to a designated facility may serve as an alternative for Rosales to exercise his right to equal protection, it is unclear how that transfer may occur without changing Rosales's classification level. Third, the issuance of an Alarm appears to have de minimis adverse impact on prison officials and other inmates;

in fact, such an issuance might decrease the tension between Rosales and nearby inmates. Finally, the alternative, that DOCCS provide Rosales with an Alarm, is simple, inexpensive, and ready. Accordingly, because there exist genuine issues of material fact, Rosales's Equal Protection claim should remain in this action.


## C. ADA and Rehabilitation Act Claims

Rosales asserts that defendants violated his rights under the ADA and the Rehabilitation Act. The ADA "applies to inmates in state prisons." Beckford v. Portuondo, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001) (citations omitted). To state a prima facie claim under the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment . . . substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test . . . First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (internal citations omitted).

25

A major life activity is defined as "caring for oneself . . . hearing, eating, sleeping, walking, . . . interacting with others, . . . ." 29 C.F.R. § 1630.2(i)(1). The Second Circuit has held that it is important to

> distinguish[] between (i) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits . . . [since] the disability statutes do not require that substantively different services be provided to the disabled, no matter how great their need for services may be. They require only that covered entities make "reasonable accommodations" to enable "meaningful access" to such services as may be provided, whether such services are adequate or not.

Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (citations omitted).

Rosales has established an ADA claim. It is undisputed that Rosales has met the first element as Rosales has a physical impairment that substantially limits his ability to hear. Furthermore, it is also undisputed that he has established the third element as DOCCS is a public entity. Clarkson, 898 F. Supp. at 1044 ("As a public entity DOCS must provide disabled inmates with an opportunity to request the auxiliary aids and services of their choice."). Rosales has also proffered facts sufficient to establish the second element as he contends that the Directive denied him meaningful access to meals, recreation, showers, and medications because it limits the types of accommodations that are available to him, an inmate classified as HL 30. Am. Compl. ¶¶ 24, 42. Specifically, even though under the Directive, DOCCS was able to provide Rosales with a hearing aid, the record indicates that the hearing aid failed to compensate for noise levels in a prison setting. Rosales Dep. at 18–19. While DOCCS is not required to provide substantively different services to inmates with disabilities, construing the facts in the light most favorable to Rosales, DOCCS has failed to provide reasonable accommodations to assure that Rosales can hear within the

prison setting and benefit meaningfully from the various existing services.  <u>Wright</u>, 230 F.3d at 548.  Therefore, defendants are incorrect in their assertion that no question of material fact surrounds whether a reasonable accommodation has been provided to Rosales by the issuance of a hearing aid.  Accordingly, defendants' motion on this ground should be denied.

To the extent that Rosales has asserted claims under the Rehabilitation Act, they too, survive this motion.  The Rehabilitation Act protects any "qualified individual with a disability . . . [from] be[ing] excluded from the participation in, . . . [or] denied the benefits of," any federally funded program "solely by reason of his or her disability . . . ."  29 U.S.C. § 794(a); <u>see</u> <u>also</u> <u>Clarkson</u>, 898 F. Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act.").  Since Rosales has established the elements of an ADA claim, he is also able to proffer facts sufficient to support a Rehabilitation Act claim.  Accordingly, defendants' motion as to such claims should be also denied.

### D.  Qualified Immunity

Defendants contend that even if Rosales's constitutional and statutory claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 F. App'x 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable

public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry must be discussed with respect to Rosales's Equal Protection, ADA, and Rehabilitation Act claims.

It is well settled that between December 21, 2009 and August 10, 2011, the Fourteenth Amendment afforded individuals the right to equal protection, even to individuals who were incarcerated. Phillips, 408 F.3d at 130 (holding that the inmate's allegations of disparate treatment because of race were sufficient to state an Equal Protection violation). Additionally during the relevant time period, it was established that the ADA and the Rehabilitation Act were applicable to inmates in state prisons. Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1952); Clarkson, 898 F. Supp. at 1034. Thus, accepting all of Rosales's allegations as true, qualified immunity cannot be granted to defendants for the alleged Equal Protection violations nor for the ADA and Rehabilitation Act claims. Accordingly, defendants' motion on this ground should be denied.


### E.  Appointment of Counsel

In his amended complaint, Rosales seeks the appointment of counsel for purposes of

this litigation.  Am. Compl. ¶ 44.  Courts cannot use a bright line-test in determining whether

counsel should be appointed on behalf of an indigent party.  Hendricks v. Coughlin, 114

F.3d 390, 392–93 (2d Cir. 1997).  As the Second Circuit stated in Hodge v. Police Officers,

802 F.2d 58 (2d Cir. 1986), "the district judge should first determine whether the indigent's

position seems likely to be of substance."  Id. at 61.  If the claim satisfies that requirement,

the court must then consider

> the indigent's ability to investigate the crucial facts, whether
> conflicting evidence implicating the need for cross-examination
> will be the major proof presented to the fact finder, the indigent's
> ability to present the case, the complexity of the legal issues and
> any special reason in th[e] case why appointment of counsel
> would be more likely to lead to a just determination.

Terminate Control Corp. v. Horowitz, 28 F.3d. 1335, 1341 (2d Cir. 1994) (quoting Hodge,

802 F.2d at 61–62).  That is not to say that all, or indeed any, of these factors are

controlling in a particular case.  Rather, each case must be decided on its own facts.

Velasquez v. O'Keefe, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (citing Hodge, 802 F.2d at

61).

   Here, the record shows that Rosales has been able to present the case and investigate

crucial facts as he made a number of court filings in response to defendants' motion for

summary judgment:

1. "Affidavit in Support of Opposition to Defendants' Motion for
   Summary Judgment," which consisted of twenty-three pages,
   nineteen pages of which contained legal arguments.

2. "Plaintiff's Statement Pursuant to Rule 7.1," which included
   six pages listing admissions, objections, and denials.

3. "Exhibits A through H," which comprised of twenty-eight
   pages from various sources.

Even though it is possible there will be conflicting evidence implicating the need for cross-examination, "this factor alone is not determinative of a motion for appointment of counsel." Velasquez, 899 F. Supp. at 974. Further, the record reveals that the issues in dispute here, which involve Rosales's denied request for reasonable accommodations, are not overly complex. Finally, this Court is not aware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of the action. Accordingly, it is recommended that Rosales's motion for appointment of counsel at this time be dismissed without prejudice.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' summary judgment (Dkt. No. 46) be **DENIED** as to all claims except the (1) failure to exhaust defense against the telephone amplifier request; (2) personal involvement defense for Rosales's Eighth Amendment claims against Fischer and Perlman; and (3) Eighth Amendments claim against LaValley and Serhan.

2. **RECOMMENDED** that Rosales's Fourteenth Amendment Equal Protection claim against all individual defendants as well as his ADA and Rehabilitation Act claims against defendant DOCCS and all individual defendants remain in this action.

3. Further **RECOMMENDED** that Rosales's motion for appointment of counsel be **DISMISSED** without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d

85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  November 2, 2012
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge